NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0063n.06

No. 19-5365

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MANZUR MAZUMDER | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | |

FILED
Jan 29, 2020
DEBORAH S. HUNT, Clerk

BEFORE:     ROGERS, KETHLEDGE, and LARSEN, Circuit Judges.

ROGERS, Circuit Judge.  Manzur Mazumder was convicted by a jury of wire fraud for a scheme in which he lied to investors and misappropriated their funds.  Mazumder now appeals his conviction, arguing that the district court abused its discretion by excluding testimony from his expert witness, a law professor, on whether Mazumder's misrepresentations met the legal requirement of materiality.  The testimony was however properly excluded as infringing on the judge's role in instructing the jury on the law, and in any event wrongly—or at the very least confusingly—stating the law.

An insurance salesman by trade, Manzur Mazumder set out to form an investment fund. He recruited a coworker, Jon Moore, as a business partner.  Mazumder told Moore that they needed to raise $400,000 in "seed money" in order to start a hedge fund.  Moore then recruited two of his

friends, Maurice Test and Judy Turner, to contribute to the fund. Mazumder also secured funding from a business contact named Ashif Jahan.

Mazumder boasted to these prospective investors of his strong financial acumen, including that he had placed third in a stock trading contest. What Mazumder did not share was that he was under investigation by state regulators for the unlicensed sale of securities and that a cease and desist order had been issued against him in Missouri. Test, Turner, and Jahan were each promised substantial returns on the amounts they contributed. In addition, Mazumder represented that their money would remain "untouched" for one year. Instead of keeping the funds frozen, however, Mazumder used some of the money to cover personal expenses and lost the rest in the stock market. Consequently, Mazumder's victims lost almost everything.

Mazumder's hardest-hit victim was Test, who invested a total of $235,000. Mazumder originally asked Test to invest $40,000 but continued to request more money. Test slowly became uncomfortable with the situation and asked Mazumder for "documentation and some information . . . attesting to show that, you know, this is a legitimate business, entity and operation." Test eventually told Mazumder that he would not send any additional money without verification that "my funds were safe, that they were on deposit, [and] that the threshold of $400,000 was getting close." In a subsequent email to Test requesting additional funds, Mazumder attached some of his bank statements in order to reassure Test his money was safe. The statements were doctored to indicate that Mazumder had bank accounts containing $220,000 and $120,000 respectively. Those accounts were in fact virtually empty. Test sent Mazumder $25,000 in response to this email and testified that he would not have sent the money had he known the bank statements were false.

Mazumder was charged with two counts of wire fraud under 18 U.S.C. § 1343. To convict a defendant of wire fraud, the government must show (1) a scheme to defraud; (2) the use of the wires in furtherance of the scheme; and (3) intent to deprive a victim of money or property. *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003). As part of the scheme-to-defraud and intent elements, "the government must prove that the defendant said something *materially* false." *Id.* at 486 (emphasis in original) (citing *Neder v. United States*, 527 U.S. 1, 25 (1999)).

At trial, Mazumder argued that the false bank statements he sent to Test were not material. According to Mazumder, because he sent signed promissory notes to Test each time he asked for money, Test was acting as a lender rather than as an investor. To help the jury understand the relevance of this distinction for purposes of materiality, Mazumder sought to introduce testimony from Lynda Black, a law professor at the University of Memphis. Professor Black teaches a variety of law courses, including secured transactions, business organizations, trust law, and estate planning.

The district court heard Professor Black's proposed testimony in a hearing outside the presence of the jury. Professor Black defined "materiality" as "a way of talking, referencing how important something is, how relevant something is." When asked about the difference between a promissory note and an investment, Professor Black explained:

> Well, with respect to a promissory note, you are looking at a straight loan. So there's no built in condition as to what will be done with the money other than that at the time stated in the note, the money will be repaid. So it's – it's not an investment, it's simply a promise to repay principal.

She went on to explain that unlike someone who manages investments, the maker of a promissory note has no fiduciary duty to the payee. Therefore,

> [w]hat is material with respect to a promissory note is an individual's ability to repay. It's – it's somewhat holistic, and I guess simultaneously somewhat less

definite, but just as a bank in making a loan where it seeks to understand a person's overall ability to repay the amount loaned on the stated terms.

Professor Black stated that a borrower's credit reports, tax returns, and financial statements showing income, assets, and debts would all be material to a lender because they create an overall picture of a borrower's ability to repay. Mazumder's attorney then presented Professor Black with a hypothetical fact pattern matching the facts applicable to Mr. Test:

> I want you to assume that the amount in an investment account that was actually 29 cents, and this is an investment account that money had been put in by a – the lender – the lender had been given money to the maker of the note, and the maker of the note had put money into an account, and the – the account actually had 29 cents in it, but that the maker of the note had misrepresented to the – the lender that the account actually had a hundred and twenty thousand, eight hundred and forty-two dollars and fifty-three cents in it when it didn't have that.

Professor Black responded that the false bank statement in the hypothetical would not be material "because it is one account taken out of context of the entire financial situation of the maker of the note. So standing alone it's not material, it's not important."

The district court sustained the Government's objection to Professor Black's testimony. The court first noted that Professor Black's testimony "would be in an area that I am required to instruct the jury." Second, Professor Black's specialized legal knowledge would not "help the trier of fact to understand the evidence and determine a fact in issue." The hypothetical proposed by counsel to Professor Black was "very long and complicated and difficult to understand," and was not "based on sufficient facts and data." Third, the district court ruled that even assuming Professor Black's testimony were probative, it would be excludable under Federal Rule of Evidence 403 due to the danger of its confusing and misleading the jury.

The jury went on to convict Mazumder of both counts of wire fraud, and Mazumder was sentenced to 60 months' imprisonment. Mazumder timely appealed his conviction, challenging only the district court's decision to exclude Professor Black's testimony.

Mazumder's brief on this appeal summarizes his argument as follows:

> Had she been allowed to testify, Ms. Black would have explained to the jury that the holder of a promissory note is dependent on the ability of the maker of the note to repay the money loaned. Material misrepresentations would have been based on credit reports, financial statements, income tax returns and the like, all with the view of determining Mazumder's ability to pay when the note comes due. Mazumder made no representation concerning these factors. On the other hand, she would have explained that an investor in equities is focused on the day-to-day performance of the equity in question. "Is the fund increasing or decreasing in value"?

The contention in this paragraph that Mazumder made no representations concerning his ability to repay is mystifying. For instance, as set out above, Mazumder sent Test bank statements doctored to show substantial funds with which to repay Test.

For three alternative reasons, the district court did not abuse its discretion by excluding Professor Black's testimony. First, the testimony would have infringed on the judge's law-defining function. Second, the legal testimony was in any event incorrect. Third, at the very least the testimony would have confused the jury.

Black's proffered testimony constitutes a legal conclusion that improperly intruded on the court's responsibility to explain the law to the jury. Professor Black invoked the word "material," attempted to define the materiality standard, and concluded that the bank statement "would not be material." "Expert testimony on the law is excluded because the trial judge does not need the judgment of witnesses." *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984); *accord Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 919 (6th Cir. 1991); *Shahid v. Detroit*, 889 F.2d 1543, 1547-48 (6th Cir. 1989). Although expert testimony may "embrace an ultimate issue," it may not "define legal terms" or state "impermissible legal conclusions." *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 592-93 (6th Cir. 2014) (internal brackets and quotation marks omitted). In *Killion*, we affirmed the district court's exclusion of an expert's attempt to define the term

"incidental work" in a wage dispute case under the Fair Labor Standards Act. *Id.* at 593. We also held excludable the expert's opinion that "the [non-exempt] work was not incidental to the sales representatives making their own sales." *Id.* In doing so, we relied on *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994), for the proposition that "recitation of legal principles . . . is not appropriate expert testimony." Indeed, we held that the district court in *Killion* did not abuse its discretion in excluding an expert's report containing impermissible legal conclusions even though the report contained permissible conclusions as well. 761 F.3d at 593.

Cases relied upon by Mazumder are distinguishable. For instance, the Fifth Circuit in *United States v. Lueben*, 812 F.2d 179, 184-85 (5th Cir. 1987), *vacated in part*, 816 F.2d 1032 (5th Cir. 1987), allowed expert testimony by an independent consultant and certified financial examiner because the defendant "sought to ask [the expert] the factual question of whether the false statements in this case would have 'the capacity to influence' a loan officer, . . . *not the legal question of whether the statements were 'material.'*" 812 F.2d at 184 (emphasis added). In *United States v. Oneida Research Services*, No. 97-cr-373, 1998 WL 59453 (N.D.N.Y. 1998), the district court permitted expert scientific testimony on issues such as whether a particular test method "requires a 10-minute heating period or simply the achievement of a specific background pressure level," not on the meaning of materiality, although the scientific issue affected the issue of materiality. *Id.* at \*3. *United States v. Lindsey*, 850 F.3d 1009 (9th Cir. 2017), involved allegedly material fraudulent statements, but "material" was defined by the court at the outset of the opinion, *Id.* at 1011, 1013, and the evidence that was held to be properly admissible was "general lending standards applied in the mortgage industry." *Id.* at 1012; *see also id.* at 1016, 1018. The testimony did not define materiality and instead explained what lenders in practice generally rely upon. *Id.* at 1018. *United States v. Green*, 698 F. App'x 879 (9th Cir. 2017) (memorandum), is similar to

*Lindsey*. In short, *Lindsey* and *Green* dealt with expert testimony as to what investors and lenders actually take into account in making their decisions, not with what the word material means as a legal matter. Professor Black's proffered testimony, while similarly explaining what banks typically consider when making loans, also purported to make a legal distinction between "materiality" for purposes of loans versus other investments. Finally, in *United States v. Wolf*, 860 F.3d 175, 184 (4th Cir. 2017), a mortgage fraud case, the expert testimony of a professor of mortgage banking was admissible to explain "to the jury how residential real-estate transactions work," and for instance how it would "affect [an] appraisal if there were a large amount of money being paid from the seller to the buyer." This is obviously not testimony as to the legal meaning of words constituting an element of the crime.

Second, even assuming that expert testimony on the abstract legal meaning of materiality could have been admitted, the legal meaning that Professor Black would apparently have put forth in this case would have been incorrect. A material misrepresentation is one that "could influence the decision of a 'person of ordinary prudence and comprehension.'" *United States v. Petlechkov*, 922 F.3d 762, 766 (6th Cir. 2019) (internal brackets omitted) (quoting *United States v. Jamieson*, 427 F.3d 394, 415-16 (6th Cir. 2005)). Professor Black stated that because a lender typically considers multiple indicators of a borrower's ability to repay, misrepresentations about one of those indicators, such as bank statements, would not be material. This fundamentally misunderstands the concept of materiality, which involves the *tendency* or *capacity* to influence a reasonable person's decision and does not require actual reliance on the part of the victim. *See Neder*, 527 U.S. at 24-25; *Petlechkov*, 922 F.3d at 766-67; *Daniel*, 329 F.3d at 486. That a lender may ultimately rely on other factors such as credit reports does not change the materiality of a

borrower's bank statements.  *See United States v. Vanderzwaag*, 467 F. App'x 402, 410 (6th Cir. 2012); *see also United States v. Anderson-Bagshaw*, 509 F. App'x 396, 415 (6th Cir. 2012).

Finally, the district court also had a sufficient basis to exclude Professor Black's testimony under Federal Rule of Evidence 403, which allows a district court to exclude relevant evidence if its probative value is substantially outweighed by a danger of confusing or misleading the jury. For the reasons given above with respect to the questionable legal validity of Professor Black's proposed testimony, that testimony would have at the very least been confusing to the jury.  This reason is sufficient on its own to exclude the evidence under Rule 403.  *Williams v. Nashville Network*, 132 F.3d 1123, 1130 (6th Cir. 1997); *Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 156 (6th Cir. 1988).

The judgment of the district court is affirmed.